**Edamarie COBURN, et al., Appellants,**

v.

**Robert E. HEGGESTAD, Appellee.**

**No. 02–CV–168.**

District of Columbia Court of Appeals.

Argued Jan. 21, 2003.

Decided Feb. 27, 2003.

Eric M. Rome, Washington, DC, for appellants.

John R. Gerstein, Washington, DC, for appellee.

Before SCHWELB, FARRELL, and REID, Associate Judges.

SCHWELB, Associate Judge:

Edamarie Coburn appeals from an order of the trial court, entered on January 18, 2002, granting Robert E. Heggestad specific performance of a contract to purchase a home in northwest Washington. Ms. Coburn, a tenant at the house, contends that the trial court's decision contravened her "right of first refusal," which, according to Ms. Coburn, gave her and not Mr. Heggestad the right to purchase the property. *See generally*, D.C.Code § 45–1637 (1996).[1] The facts and applicable law are discussed in detail in a comprehensive and well-reasoned opinion by the trial judge, Honorable Cheryl M. Long. We adopt Judge Long's opinion, which is attached hereto and made a part hereof, and we add only a few brief observations.

■ Ms. Coburn directs the court's attention to D.C.Code § 45–1637,[2] which creates a 15–day period in which a tenant may exercise the right of first refusal.

The statute provides in pertinent part that *"all rights specified in this subchapter shall apply* except the minimum negotiations period specified in [§] 45–1638(2) . . ."* (emphasis added). One of those rights, Ms. Coburn contends, is a right to extend or revive the 15–day period. A thorough review of the statutory scheme, however, reveals no such right. To be sure, the statute provides for the extension of a 60–day negotiation period, D.C.Code § 45–1638(2),[3] a 90–day negotiation period, D.C.Code § 45–1639(2),[4] a 120–day negotiation period, D.C.Code § 45–1640(2),[5] a 60–day settlement period, D.C.Code § 45–1638(3),[6] a 90–day settlement period, D.C.Code § 45–1639(3),[7] and a 120–day settlement period, D.C.Code § 45–1640(3).[8] None of these provisions, however, creates either a specific right to extend or revive the 15–day period for the right of first refusal or a right to extend time periods generally.

Moreover, D.C.Code § 45–1633,[9] which describes the rights of third parties, contemplates that only negotiation periods and settlement periods, not the right-of-first-refusal period, can be extended.

> The time periods for *negotiation* of a contract of sale and for *settlement* under this subchapter are minimum periods, and the owner may afford the tenants a reasonable extension of such period, without liability under a third party contract.

(Emphasis added.) The entire statutory scheme thus unambiguously differentiates between those time periods which are ex-

---

**1.** Now codified as D.C.Code § 42–3404.08 (2001).

**2.** D.C.Code § 42–3404.08 (2001).

**3.** D.C.Code § 42–3404.09(2) (2001).

**4.** D.C.Code § 42–3404.10(2) (2001).

**5.** D.C.Code § 42–3404.11(2) (2001).

**6.** D.C.Code § 42–3404.09(3) (2001).

**7.** D.C.Code § 42–3404.10(3) (2001).

**8.** D.C.Code § 42–3404.11(3) (2001).

**9.** D.C.Code § 42–3404.04 (2001).

tendable, such as the negotiation and settlement periods, and those, such as the right-of-first-refusal period, which are not. Ms. Coburn's position cannot be reconciled with the text of the Act.

Ms. Coburn also contends that she was excused from exercising her right of first refusal within the 15–day period because, first, the contract between Mr. Heggestad and the seller did not include Mr. Heggestad's printed name (though it did include his legally operative signature), and second, the contract omitted a letter referenced by a hand-written footnote in the contract.[10] On their face, these omissions were altogether peripheral; the contract contained all material terms. If Ms. Coburn had been sincerely concerned that either of these omissions affected the material terms of the contract, she would have had ample opportunity during the 15–day period to make appropriate inquiries. She did not. We are satisfied, as was the trial judge, that under these circumstances Ms. Coburn cannot, after the expiration of the 15–day period, challenge the validity of the contract or its sufficiency to start the running of that period.

For the foregoing reasons, and for the reasons stated in the trial judge's opinion, the judgment is hereby

*Affirmed.*

## ATTACHMENT

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

ROBERT E. HEGGESTAD,

10. The footnote, which was appended to one of the three owners' signatures, stated that this particular owner agreed to the contract "[p]roviding conditions set forth in 9–30–99 letter of J. Williams re division and dispersal of funds due re sale are adhered to."

v.

JOHN E. CROMMELIN, *et al.*,

Civil Action No. 6092-00

Calender 5

### MEMORANDUM ORDER

The purpose of the instant order is to set forth findings of fact and conclusions of law, following a non-jury trial before this Court. The litigation herein concerns a complaint for specific performance of a contract to purchase realty. Counterclaims were interposed, as well. The property in question is a house located at 1513 30th Street, N.W. in the District of Columbia. Two different persons claim that they are entitled to purchase the house. One of them is the plaintiff and the other person is defendant Ted Gossett, as assignee of defendant Edamarie Coburn. Coburn was a tenant in the house, at the time that the plaintiff executed a contract of sale with the owners. Coburn contends that she is somehow still entitled to purchase the house pursuant to a competing contract that was accepted by the sellers after the expiration of Coburn's statutory period for asserting her "right of first refusal." It is evident that Coburn's assignment to Gossett is conditioned on her success in the instant litigation.[1]

The question of plaintiff's entitlement to specific performance turns on how the Court will interpret and apply certain provisions of the Rental Housing Conversion and Sale Act of 1980, in light of the operative facts. Most of the salient facts are not disputed.

1. She will receive the sum of $150,000 in exchange for the assignment, if she prevails herein.

Defendants have included Counterclaims along with their respective Answers. All five defendants seek a judgment declaring that the Coburn contract is enforceable. Based upon the following analysis of the facts and law, this Court is convinced that the plaintiff has established his right to specific performance and the entry of judgment in his favor. For this reason, the Counterclaims must fail.

The District of Columbia Code provides a well-established system through which a tenant may exercise rights to purchase the rental property when it is offered for sale. The statutory scheme is a precise timetable under which the tenant must exercise such rights. For purposes of placing the instant case in perspective, it is appropriate to recapitulate the relevant deadlines that a tenant must meet, as well as the corresponding requirements imposed on the landlord/seller.

The Court notes that subsequent to the filing of the instant lawsuit, the Council of the District of Columbia re-codified much of the Rental Housing Conversion and Sale Act of 1980. Until now, the Act was codified at D.C.Code § 45–1601 *et seq.* For simplicity, this Court will cite in text the original Code sections and subsections from Title 45, now found in Title 42 of the 2001 Replacement Volume of the Code. The corresponding updated Code citations appear in footnotes.

**Statutory Purchase Rights of a Tenant.** First, when a rental property is offered for sale, the landlord must communicate to the tenant an "offer of sale." During the 30–day period then commencing, if the tenant desires to purchase the property, the tenant must provide the owner with a "clear expression of interest" in writing. D.C.Code § 45–1638.[2]

Second, for 60 days following the expiration of the initial 30–day "offer of sale" response period, the tenant may negotiate with the landlord, and the landlord cannot sell the property to anyone else while this time period is running. D.C.Code § 45–1638.[3] This period of negotiation may be extended. The law specifically provides that "the owner shall afford the tenant a reasonable period to negotiate a contract of sale, and shall not require less than 60 days, not including the 30 days provided by paragraph (1) of this section." D.C.Code § 45–1638.[4]

A landlord is specifically shielded from liability to the third party in granting any extensions of time to the tenant for negotiation purposes. The Code states, "The right of a third party to purchase an accommodation is conditional upon exercise of tenant rights under this subchapter. The time periods for negotiation of a contract of sale and for settlement under this subchapter are minimum periods, and the owners may afford the tenants a reasonable extension of such period, without liability under a third party contract." D.C.Code § 45–1633.[5]

■ Third, whether or not the tenant is already negotiating with the landlord, if the landlord obtains a contract of sale from anyone other than the tenant, the Code provides that the tenant must be allowed 15 days in which to exercise what is known as the "right of first refusal." D.C.Code § 45–1637.[6] The landlord must provide the tenant with a written Notice of this third-party contract, to start the running

2. See D.C.Code § 42–3404.09(1) (2001 Repl.).

3. See D.C.Code § 42–3404.09(2) (2001 Repl.).

4. See D.C.Code § 42–3404.09(2) (2001 Repl.).

5. See D.C.Code § 42–3404.04 (2001 Repl.).

6. See D.C.Code § 42–3404.08 (2001 Repl.).

of this 15–day period. The tenant is entitled to receive a copy of "a valid sale contract to purchase by a third party." *Id.* If the tenant does not respond with a matching contract within the 15–day period, the existing contract is automatically deemed to be the "primary" contract and the landlord is then free to sell the property to the third party. *Lealand Tenants Ass'n, Inc. v. Johnson,* 572 A.2d 431, 434 (D.C.1990). The Act manifestly does not contain any provision for extensions of time of the 15–day period covering "right of first refusal."

All of the rights summarized above are enforceable by a tenant. The Code does not provide any other rights that are enforceable by the tenant. Moreover, the statute does not provide for extensions of any of the deadlines, either unilaterally by either party or by consent, *except* as to negotiation and settlement with the tenant.

**Undisputed Material Facts.** It is useful to set forth the undisputed facts of record, as they fall within two key episodes: (1) the actions of the parties during the statutory period providing rights to the tenant; and (2) the actions of the parties following expiration of the statutory period of tenant's rights.

*Actions During the Statutory Period Providing Rights to the Tenant.*

When they decided to sell the house, the sellers transmitted an offer of sale to Coburn on June 25, 1999.

During the 30–day period following receipt of this notice, Coburn did not make a "clear expression of interest" in order to exercise her right to purchase the property under the Act.

During the 60–day period following the expiration of the 30–day initial period, Coburn also made no effort to negotiate a contract of sale, and Coburn did not even tender a tardy proposed contract. This period expired without this tenant exercising any of her statutory rights whatsoever.

On September 16, 1999, plaintiff Robert E. Heggestad and the owners entered into a contract for the sale of the house. Under this contract, the owners agreed to sell the property to Heggestad subject to certain contingencies. Those contingencies included the rights of tenants under the District of Columbia Code.

Pursuant to D.C.Code § 45–1637, the owners gave Coburn a 15–day window of time within which to exercise her "right of first refusal," specifically to allow her to match the contract that had been executed with Heggestad.

Without question, the owners sent Coburn a bona fide Notice of her "right of first refusal." They sent the Notice on October 6, 1999. According to the undisputed trial testimony of the listing agent (Jonathan Taylor), the Notice was sent by three different methods. It was transmitted to Coburn by certified mail, hand-delivery, as well as regular first class mail. He testified that the contract had been fully ratified by all parties at the time that the Notice was sent. This point is not disputed. It is also not disputed that the copy of the contract that was sent to Coburn did include the signature of the plaintiff, although the plaintiff's name was not printed on the face of the contract.

In her trial testimony, Coburn admitted that she read the entire contract as soon as she received it.

During the 15–day period within which Coburn could have matched the plaintiff's contract, she failed to do so. It is undisputed that during this period she made no demands of any kind on the owners, *i.e.* no demands for further information, no demands for clarification, etc. She made no

inquiries of the owners during this period. She made no offers of any kind with respect to any potential purchase of the house. She also made no requests for any extension of time, regardless of whether she knew that the Code did not provide for this option.

### Actions of the Parties Subsequent to the Statutory Period Affording Rights to the Tenant.

Ultimately, the owners engaged in certain conduct that was contrary to the interests of the plaintiff. They allowed Coburn to submit a matching contract even though it was beyond the "right of first refusal" deadline under the Act.

In a nutshell, the owners accepted Coburn's contract based on her contention that she had a "concern" that she had failed to fully pursue prior to the end of the 15–day final Notice period. They allowed her to submit a tardy contract without any notice whatsoever to Heggestad.

The alleged focus of Coburn's "concern" is a footnote that appears on the signature page of the plaintiff's contract. The footnote states, "Providing conditions set forth in 9/30/99 letter of Jay Williams re division and dispersal of funds due re sale are adhered to." A copy of the contract is in the trial record as Plaintiff's Exhibit 4.

It is uncontested that this footnote refers to a letter authored by Jesse M. Williams, III, addressed to the plaintiff. A copy of that letter is in the trial record as Plaintiff's Exhibit 7A. The letter is a reminder that, upon closing the sale, the net proceeds are to be disbursed in equal shares to three persons: Katherine C. Milton, Jill B. Crommelin, and Jesse M. Williams, III. The letter was not attached to the contract.

It is uncontested that the letter, by its own terms, did not impose any substantive rights or obligations on the buyer, whoever that person might be. It is also uncontested that the letter did not impose obligations on the sellers and did not confer any rights on the sellers.

**The Legal Dispute.** The undisputed facts of record might suggest that this litigation could have been resolved through summary judgment motions. The previous calendar judge nonetheless determined that it was necessary for the parties to present trial evidence on the subject of the validity of the plaintiff's contract. Indeed, this was the sole topic of the evidentiary proceeding before this Court.

The legal dispute reflects two different sub-issues. One, the Court must determine if the plaintiff's contract was valid as a matter of law. If it is not, then there should be no basis for ordering specific performance of the plaintiff's contract. Two, even if the contract is valid, the Court must determine whether (as Coburn argues) the Code is ambiguous in a way that yields a bar to third party liability for specific performance under the circumstances presented herein

In light of the fact that Coburn's statutory "right of first refusal" was never exercised, the issues noted above are actually *post hoc* theories as to why it should make no difference that Coburn slept on her only enforceable rights.

**Legal and Factual Analysis.** Below, the Court sets forth two primary areas of analysis of the record and applicable law. For several reasons, this Court concludes as a matter of law that the plaintiff has amply demonstrated his entitlement to relief and that none of the arguments of Coburn have merit. This is not a close question.

*Alleged Invalidity of Plaintiff's Contract.* Coburn argues that the plaintiff's contract was "invalid" for two reasons: (1) because the copy provided to her did not reflect the plaintiff's printed name, even though it did bear his signature; and (2) that it lacked a letter that should have been affixed to it as an addendum or attachment to the substance of the contract. Neither the plaintiff's printed name nor the letter was a "material" missing piece of the plaintiff's contract as far as notice to Coburn is concerned.

First, there is no legal basis for the Court to conclude that the failure to provide the printed name of the purchaser in addition to that person's signature affects the validity of the contract. There is no statutory requirement of divulging such information to the tenant (or to any other purchaser in the open market, for that matter).

Counsel for Coburn argues that a tenant might want to learn about the competitor's reputation, experience, and intent with regard to the property. Counsel has argued that these factors might influence a tenant's decision to buy, assign, or attempt to remain as a renter. Counsel implies that without the printed name in addition to a signature, the purchaser is not being identified. The only persons who have standing to complain about not knowing the identity of the plaintiff are the sellers, not Coburn. To be sure, the identity of the plaintiff, though material as between buyer and seller, has never been unclear to the sellers.

The only issues that are relevant to the competing contracts are the economic factors, *i.e.* purchase price and conditions of sale. There is no need to provide the printed name or personal information regarding the competitor to the tenant who is attempting to decide whether to submit a contract. This is a red herring. The tenant is either interested in owning the property or she is not interested in doing so. Whether she approves of her new landlord if she does *not* buy the property is utterly irrelevant.

While a tenant might be curious about all sorts of innuendo, rumors, and speculation regarding another potential owner/landlord, there is no statute or case law that grants to any tenant the right to demand any identifying data about a purchaser. This issue of a printed name is entirely irrelevant to the tenant's right of first refusal. If anything, a tenant who desires to purchase the property would be the new owner, not a curious tenant of a different new owner. Thus, the need to know the plaintiff's formally spelled-out name is an absurd demand that only obfuscates the real issue in this case.

Here, if the tenant had desired to submit a contract that carried with it a condition of divulging the printed name of the plaintiff, she could have done so. Whether or not this condition of sale would have been taken seriously, the Court cannot say. In any event, if she did not otherwise match the material *financial* terms of the contract, this other issue would not have been pertinent at all. Whatever may have been at the root of her hesitance, she failed to act. She cannot finesse this fact.

Yet another red herring is seen in the argument concerning the letter and the footnote on the plaintiff's contract. This, too, is a diversion from the real issue in this case. In the Court's view, the real issue is whether the seller may, without third-party liability, gratuitously extend *non-statutory* rights to the tenant so as to trump a bona fide contract that has been tendered already by another person.

Under no theory can the Court deem the letter from Williams to be material to the plaintiff's contract. It had no connec-

tion to the terms of the sale itself. Indeed, it did nothing more than state the obvious, *i.e.* that at the time of closing, the proceeds should be divided equally among the three sellers. It is utterly inconsequential that the contract contained a footnote that was only a ministerial "reminder" to the sellers. In reality, the operative person who might need the reminder is the escrow agent or settlement agent, not the buyer.

In any event, it is clear to this Court that the "unprinted" name and the footnote were not in fact the real reason why Coburn failed to act within the 15–day final Notice period. The answer to this riddle is found in her own testimony, *i.e.* that she was simply worried about an unresolved issue of her own liability for the fire damage. To the extent that Coburn now implies that she drew any connection between the letter and the fire problem, this Court totally disbelieves Coburn.

In her trial testimony, Coburn explained the details of why she did not respond to the contract within the 15–day statutory time period that secured her right of first refusal.

Coburn testified that when she first received the ratified contract, it gave her a "great deal of cause for concern." Tr. at 39. She elaborated:

> On December the 19th, 1997, there had been a fireplace accident in the house which involved five parties. It had not been rectified and I thought that this might be, you know, engaging me in some kind of liability if I didn't know what the attachments were.

Tr. at 39. She admitted that she never asked the sellers for a copy of the letter, although she asked her attorney to get a copy. Tr. at 40. However, this did not occur until after the 15–day right of first refusal period had expired. Tr. at 49.

Under cross-examination, Coburn admitted that the footnote in the contract (and the related letter) were not really pivotal to her "concern" at all. Tr. 42. Rather, she admitted, "I had been continuously concerned about the liability and had even written a letter to Mr. Taylor that indicated that before the property was shown to the public it would be a good idea if they inspected it so they could see where we were at." Tr. 42–43. She further explained that there was a lingering insurance claim regarding the fire damage. She had a dispute concerning the cost of cleaning furniture. At least $26,000 was in question. Tr. at 43. Coburn emphasized in her testimony that her "concern" about her potential liability for the fire damage is still unresolved. She stated, "There were five parties involved, not one had signed off on any of the accident and I just didn't know. I was concerned." Tr. at 44.

Until the time of trial, neither Coburn nor any other party in this case has ever suggested that the substance of the letter was material in any way to the contract. Neither Coburn nor any other party in this case has ever suggested that the administrative issue of dividing the sales proceeds was ever a component of negotiating the sale itself.

In her trial testimony, Coburn did not mention that she had any "concern" about not seeing the printed name of the plaintiff in addition to seeing his signature. She has never testified that she could not determine the plaintiff's identity from his signature, or that his identity was actually of any interest to her. She has not testified that the identity of the plaintiff would have influenced the financial elements of her own proposed contract.

On the witness stand, Coburn was at least candid as to what caused her not to

exercise her statutory rights. Nonetheless, she freely relies now upon her lawyer's argument that the footnote and letter were the real crux of her inability to assess a "complete" contract. Coburn's own testimony utterly belies any such argument. Under no circumstances could Coburn rationally believe that the mere mention of how the sellers' money should be disbursed was in any fashion related to the fire liability issue.

Coburn's hesitance to tender a contract, at best, was based upon the lack of resolution of the fire liability issue, although she cited other highly personal matters as well (such as a family loss). Even if the letter was non-existent and even if the footnote did not exist, her unreadiness about the fire liability had a life of its own. At no point did Coburn alert the sellers that the fire issue was hindering her ability to put forth a contract.

The whole discussion of the letter is a complete diversion from the true issue that drives this litigation.

*Alleged Ambiguity of the Act.* Through counsel, Coburn argues that the Act is ambiguous as to whether a landlord may gratuitously grant the tenant an extension of the 15–day "right of first refusal" period, and if it does, whether the Code still shields the landlord from third-party liability when such an extension is provided.

Coburn appears to argue that the ambiguity is reflected by the fact that the Code is merely silent as to any other permissible and protected extensions of time that may be granted to a tenant. This is not evidence of ambiguity. If anything, it simply reflects that the legislature chose to allow extensions of time for one reason, but not for other reasons. This was the legitimate policy choice of the legislature. It is not an ambiguity of any sort.

■ The Court pauses to note that the Code provision allowing extensions of time for negotiation and settlement with the tenant is an integral part of the whole public policy underpinnings of the Act. Allowing an extension of time for this discrete reason is utterly consistent with and supportive of the key purpose of the statute. That key purpose is to insure that a tenant is given a fair opportunity to purchase the property and that this opportunity is not lost because of a surprise sale to another person. It makes sense that once a tenant has seized his or her opportunity to act, the landlord should be able to afford reasonable extensions of time without worrying that the third party will thwart the tenant by suing the landlord.[7] Indeed, this is quite obviously why the Code specifies that, in this very narrow subject of contract negotiation, there cannot be any liability to third persons. The whole approach is borne of a clear public policy decision.

■ Coburn's theory of ambiguity seems to be that the Code shields the seller from liability to third persons when the seller extends to the tenant additional time for negotiation and settlement. Coburn implies that this leaves open the possibility that, in extending deadlines for other reasons, the seller is free to do so even though there is the specter of being held liable to a third person. In other words, it is this possibility that Coburn contends leaves the defendants with the legal right

---

7. In any purchase of real estate, the offeror's ability to proceed according to a timetable can be compromised by circumstances that are beyond the control of the buyer (and the seller). The best examples are seen where financial institutions cannot be forced to make decisions at the convenience of a buyer (or seller). The same is true where title searches take longer than expected.

to accept Coburn's contract and refuse to honor the plaintiff's contract. This is Coburn's way of claiming that the defendants are required to go to settlement on her contract, without regard to owing damages of any kind to the plaintiff and without being subject to equitable obligations imposed by the Superior Court. This Court is convinced that there are no such "possibilities" because the Code simply does not permit them. The absence of further protections against third party liability are not accidental or reflective of any ambiguity, because the Council has undertaken to closely regulate this subject.

■ Coburn's theory is no more than a bald request that the Court re-write the statute, since the statute is not ambiguous at all. Coburn's argument "ignores a basic rule of statutory construction: that when a legislature makes express mention of one thing, the exclusion of others is implied, because 'there is an inference that all omissions should be understood as exclusions.'" *McCray v. McGee*, 504 A.2d 1128, 1130 (D.C.1986), quoting 2A Sutherland, *Statutes and Statutory Construction* § 47.23 (4th ed.1984).

The Code explicitly creates an exemption from third party liability as to *only one* very clear category of activity (*i.e.* landlord-tenant negotiation and settlement). Thus, the Court can easily infer that the legislature did not intend to grant this shield from liability for any other type of transaction or activity between landlords and potential purchasers.

■ Where there is no facial ambiguity in a statute, it is not the Court's business to second-guess what the legislature might have done if it had chosen to draft the statute differently. There is no proper reason for this Court to attempt to add anything to this statute. The Superior

Court has no authority to legislate a shield from third-party liability for a landlord/seller who gratuitously extends a tenant's statutory deadline for exercising her right of first refusal. This is squarely what Coburn is asking this Court to do.

■ Above all, the only rights accorded to anyone under the Act are rights that are enforceable by a tenant. Since the tenant has never pro-actively sued the landlord for attempting to sell this house in violation of the Act, there is no basis for any type of lawsuit that should halt the sale to the plaintiff. Here, the sellers did comply with the Act as far as the tenant's own rights are concerned. In this context, since the sellers elected to ignore the valid contract of the plaintiff, they have no defense to a suit for specific performance. Coburn and her assignee likewise have established no grounds to deny relief to the plaintiff.

■ The instant case is not a discrete instance of breach of one or more terms within a contract, such that money damages are relevant. Rather, the scenario herein presents the more fundamental problem of a refusal to perform a valid contract altogether. In these kinds of situations, the law recognizes that equitable remedies are necessary and appropriate in order to enforce the rights that relate to realty. As the Court of Appeals has observed, "When real property is the subject matter of the agreement, the legal remedy of damages is assumed to be inadequate, since each parcel of land is unique; specific performance is warranted in such a case." *1010 Potomac Assoc. v. Grocery Manufacturers*, 485 A.2d 199, 212 (D.C. 1984); *Flack v. Laster*, 417 A.2d 393, 400 (D.C.1980); *City Stores Co. v. Ammerman*, 266 F.Supp. 766, 776 (D.D.C.1967), *aff'd*, 129 U.S.App.D.C. 325, 394 F.2d 950 (1968).

For the sake of brevity, the Court will not pause to repeat the details of all of the arguments raised by the parties. For example, the sellers suggest that the plaintiff is in a weak position because he did not bother to specify in his contract that there should be certain limitations on the rights of the tenant. This argument does not impress the Court because the relevant statute is so specific as to the legally enforceable rights of a tenant. There was nothing to add to this, where providing that the contract was simply subject to statutory rights (whatever they were). There is no statute or case law that would have required the plaintiff to specify anything so as to protect the sellers from liability to him if they gratuitously did more than what the Code required them to do for the tenant. In some respects, the written arguments of the plaintiff are more detailed than the findings and conclusions of this Court. They are well supported and the Court incorporates them herein by reference, both as to case citations and policy discussions regarding the purpose and scope of the statute.

*Conclusion.* The plaintiff herein does not seek money damages. Rather, the plaintiff merely seeks to obtain what is already granted to him under a valid contract. Hence, he is entitled to declaratory relief and a judgment for specific performance.

To the extent that any Counterclaims are premised on defeating the plaintiff's case, such Counterclaims must be denied as a matter of law and judgments must be imposed against those defendants in favor of the plaintiff.

There is still an issue remaining as to attorneys' fees that are claimed pursuant to the Rental Housing Conversion and Sale Act of 1980. This issue was highlighted at the time of trial by counsel for the sellers. The parties should attempt to settle this issue, in light of this Court's ruling herein. If the matter cannot be settled, the Court will adjudicate this matter, upon being apprised of the failure of settlement negotiations. Upon request of the parties (communicated to chambers staff), the fee issue can be referred for formal mediation through the Multi–Door Division.

WHEREFORE, it is by the Court this 18th day of January, 2002

ORDERED, ADJUDGED AND DECREED that the contract executed between the plaintiff and defendants Jill Crommelin, John Crommelin, and Katharine Milton is valid and enforceable through specific performance without further delay and with no obligations of any kind to defendants Coburn or Gossett; and it is

FURTHER ORDERED, ADJUDGED AND DECREED that the contract tendered by Coburn to defendants Jill Crommelin, John Crommelin, and Katherine Milton is not enforceable by Coburn or by her assignee; and it is

FURTHER ORDERED that that judgments shall be entered in favor of the plaintiff as to **specific performance** of the plaintiff's contract for the sale of 1513 30th Street, N.W. in the District of Columbia; and it is

FURTHER ORDERED that the Clerk of the Court shall enter the separate judgment, filed of even date herewith, as to the Complaint and as to all Counterclaims; and it is

FURTHER ORDERED that counsel for the codefendant/sellers shall file, no later than February 28, 2002, a Memorandum to the Court, explaining whether the parties have settled the matter of attorneys fees or whether a ruling from the Court is still necessary.

s/ Cheryl M. Long

Cheryl M. Long
Judge
Docketed JAN 24, 2002